293 So.2d 288

**Ray WYATT et al.**

v.

**E. W. RILEY and Dimmis W. Riley.**

**SC 420.**

Supreme Court of Alabama.

April 4, 1974.

Rehearing Denied May 2, 1974.

278

Corretti, Newsom, Rogers & May, Birmingham, for appellant C. O. Osborn.

· Hardin, Stuart & Moncus, Birmingham, for appellant James G. Clark, Jr.

Billy L. Church, Pell City, for appellant Ray Wyatt.

Whitmire, Morton & Coleman, Birmingham, Prentiss M. Rainey, Springville, Nash, NeSmith & Walker, Oneonta, for appellees.

BLOODWORTH, Justice.

Respondents Ray Wyatt and C. O. Osborn appeal from a decree of the Circuit Court of St. Clair County declaring a warranty deed (and contemporaneous purchase money mortgage) executed by complainants, E. W. Riley and wife Dimmis W. Riley, conveying 2,810 acres to respondent Osborn, to be null and void and ordering both the deed and mortgage set aside on the ground that they were procured by undue influence. Respondent James G. Clark, Jr., appeals from that portion of the decree which ordered five promissory notes executed by complainants to respondent Clark (an alleged "finder's fee" for procuring the same conveyance of land) to be canceled and set aside. We affirm.

The bill as last amended alleges, in substance, that respondent Wyatt on the date the deed was executed had acquired and exercised undue influence over the complainants; that by reason of such undue influence, Wyatt, while acting in concert with all other respondents, induced the complainants to convey their land to Osborn for a consideration greatly less than its value. It alleges: that, for the purpose of inducing said conveyance, respondents falsely represented to complainants that the terms of the sale were in the best interest of the complainants; that $333.50 per acre was the fair value of the land; that it

would be in the complainants' best interest if they would not discuss or inform their regular attorney about the sale until after the sale had been made; that respondents would engage for the complainants a competent and independent counsel to represent their best interests in the transaction; and, that the complainants would not incur the expense of a real estate broker's commission. The bill alleges that the representations were false, and that the respondents made such representations with knowledge of their falsity or with reckless disregard as to whether the representations were true or false.

Testimony was taken ore tenus for eight days before The Honorable L. P. Waid, Circuit Judge. The court issued two decrees in this matter, the first on May 7, 1973, and a supplemental decree on May 15, 1973. In these two decrees the court made extensive findings of fact and concluded, viz.:

"Considering all of the evidence, the Court finds that they, the complainants, were under undue influence from the respondents Wyatt, and that the beneficiary of the influence, the respondent Osborn, was aware of the influence being exerted by the respondent Wyatt."

And, with regard to respondent Clark, the court concluded, viz.:

"The checks were without consideration, and a 'finder's fee' was not mentioned in any of the various contracts drawn up in the transactions and were not discussed by the complainants with any lawyer, and were not presented to the complainants until many drinks later after the deed was signed."

Accordingly, the court canceled the deed, the purchase money mortgage, the notes given as a finder's fee to Clark and ordered damages paid in the amount of $13,216.00 as compensation for timber removed from the land by respondent Osborn.

■ Respondent Osborn sets forth twelve assignments of error attacking the trial court's decree; respondent Clark, five assignments of error; and respondent Wyatt, twelve assignments of error. In sum, these assignments of error challenge the sufficiency of the evidence to support the trial court's decree.

Respondents argue that undue influence, as a species of fraud, must be proven by clear and convincing evidence; that influence to be undue must be such as to overpower the will of the grantor and dominate it to such an extent that the will of another is substituted for that of the grantor; that the burden is on the party seeking to set aside a deed to prove such influence or to prove a confidential relationship giving rise to a presumption of undue influence; and finally, that when a transaction is fairly susceptible to two constructions, the one which will free it from imputation of fraud will be adopted.

While we do not dispute the above stated principles of law, as applied to this cause, we think there was sufficient evidence to support the trial court's findings of undue influence. Accordingly, we affirm.

It is well established that where evidence is heard orally before the trial court, the finding of the court has the effect of a jury's verdict and will not be disturbed on appeal unless plainly erroneous, whether in law or equity. And we must affirm the trial court's decree, if fairly supported by credible evidence under any reasonable aspect. Jackson v. Rodda, 291 Ala. 569, 285 So.2d 77 (1973). This rule has been applied in numerous cases where a deed was sought to be set aside because of the incompetency of the grantors, or undue influence or both. See Chrisman v. Brooks, 291 Ala. 237, 279 So.2d 500 (1973) and cases cited therein.

While the evidence in the case at bar is conflicting on many points, the testimony most favorable to the complainants tends to show that complainants Mr. and Mrs. Riley were 83 and 74 years of age respec-

tively at the time of the conveyance; that Mr. Riley had had a stroke a few years earlier and that he had not been physically or mentally well since that time. Several witnesses testified to the effect that Mr. Riley was not mentally alert, was emotionally slow, was depressed, disinterested, forgetful, etc. Mr. Riley's personal physician testified that it was his opinion that Mr. Riley probably did not have the mind or mental sufficiency to understand a complicated transaction.

With regard to Mrs. Riley, there was testimony that Mrs. Riley was an alcoholic as well as having a long history of other mental problems for which she has been hospitalized from time to time and for which she was being treated at the time of the conveyance. There was testimony that Mrs. Riley is also deaf which added to her communication problem.

The events leading up to the conveyance as they appear from the testimony most favorable to complainants are as follows: Respondent Wyatt had been a friend of some years of the Rileys, but was not particularly close. Sometime in January, 1972, Wyatt invited Mr. Riley to fly with him and respondent Osborn to Florida "for the trip." After this trip, Wyatt began to see the Rileys more frequently. Shortly thereafter, Wyatt suggested to Mr. Riley that he had a man who would buy the Rileys' land if Mr. Riley wanted to sell. Mr. Riley stated that he would not sell without consulting his attorney. (Mr. Riley had a regular attorney, a Mr. Rainey, on a retainer of $600 per month.) Mr. Wyatt stated that there wasn't any need to consult an attorney; that he had an attorney who was good and had done considerable work for him who would take care of everything; that he didn't want Mr. Riley to discuss the proposed sale with Rainey because Wyatt wanted the deal "quiet" and Rainey's knowing might "throw a wrench in the machinery." (Additionally, there was testimony that later when Rainey directly asked Wyatt what was going on be-

tween him and the Rileys, Wyatt refused to tell him.) Rainey, in addition to being the Rileys' attorney, lived rent free in a residence located on the real estate, called "The Logs."

Wyatt then contacted an attorney from Birmingham, and arranged for the attorney to represent the Rileys.[1] The first time Mr. Riley had any contact with this attorney was when he met him in Wyatt's office. At that meeting arranged by Wyatt, the attorney arrived with a completely drafted contract for sale of the Riley lands signed by respondent Osborn, and an earnest money check for $20,000.00 already signed by Osborn. Mr. Riley had not discussed the terms of the sale with this attorney at all prior to this meeting, nor had he ever met him prior thereto.

While the Birmingham attorney was described by Wyatt to Mr. Riley as Wyatt's attorney, testimony of the attorney revealed that he had never represented Wyatt, but that the attorney had represented respondent Osborn off and on for the past twenty years, and further that he and Osborn were both investors in another real estate venture prior to and at the time of the conveyance. None of these facts were made known to the Rileys.

A series of meetings between the parties then followed, the chronology of which is less than clear. In all meetings concerning the transaction Wyatt was either present or the person who arranged the meetings. Mr. Riley testified that he was not fully informed about several important features of the contract. For example, in response to Mr. Riley's questions concerning release clauses in the contract, the Birmingham attorney reportedly answered only that they were customary in a deal of this kind. Nevertheless, a contract for sale of all the Riley lands was signed by the Rileys (on two different occasions) providing for a closing in 60 days. Mr. Riley testified he never received a copy of this contract.

Some two and one half to three weeks later, the Rileys were invited to dinner at

---

1. This attorney is not one of the attorneys who represented any of the parties in this cause.

the Wyatt's. Mr. Riley testified that nothing was said in advance about closing the transaction that night. There was testimony that Mrs. Riley was unwell that evening and that both the Rileys were drinking. Mr. Riley testified that he did not recall reading the closing papers or having them read to him that evening. Mr. Riley testified he signed the papers because he trusted Wyatt.

That same evening the Rileys signed five notes totaling $46,856.75 payable to respondent Clark as a "finder's fee." There was testimony that Mr. Riley was not told what the notes were for and that the Rileys had never requested Clark to act as their agent in selling the property nor ever discussed a finder's fee or commission with Clark.

There was expert testimony that the value of the property was considerably in excess of the one million dollar purchase price specified in the contract; that the release clauses did not have the usual provisions for the protection of the sellor; and, finally, Mr. Riley testified that he thought he was getting $1,000,000 cash, whereas the contract made the $1,000,000 payable over a period of nine years without accruing interest on the unpaid balance.

Finally, while Wyatt testified that he had not received any payment for his part in the transaction, there was testimony that two debts (totaling $11,000) owed by Wyatt to the Rileys was orally forgiven in recognition for his services and that shortly after this transaction respondent Osborn lent Wyatt (who was in financial troubles) $15,000 in cash without interest and without any writing evidencing the indebtedness. Wyatt and Osborn soon afterwards became involved together in another real estate transaction in which Wyatt would participate in the profits from Osborn's sale of 1,800 acres Osborn had purchased in Florida. Wyatt, although he claimed not to know Clark well, was also involved with respondent Clark on a 50-50 profit sharing arrangement in an insurance underwriting company near to the time of the

transaction. It was Wyatt who paid the Birmingham attorney for the legal services rendered in the transaction. The Rileys paid no legal fees.

We allude to the following principles of law which we consider to be applicable to the case at bar.

■ Undue influence is variously defined as influence that dominates the grantor's will and coerces it to serve the will of another, Adair v. Craig, 135 Ala. 332, 33 So. 902 (1902); influence which renders the grantor the passive agent of the dominating will of another, Cox v. Parker, 212 Ala. 35, 101 So. 657 (1924). In determining dominance, however, it is not a question whether the party knew what he was doing, had done, or proposed to do, but how the intention was produced. Wooddy v. Matthews, 194 Ala. 390, 69 So. 607 (1915).

■ The burden is on the party who seeks to set aside a deed to prove "undue influence" as defined above. Wooddy v. Matthews, supra. At the same time, however, it is recognized that undue influence is a species of constructive fraud which is difficult of direct proof, and requires that much latitude be allowed in the testimony. Barkley v. Boyd, 211 Ala. 50, 99 So. 196, 197 (1924).

The person who ultimately benefits from the undue influence need not be the person who exerted the influence. Deeds have been declared void where a party abused his influence with the grantor in order to procure a deed from the grantor to a third party. See, e. g., Martin v. Evans, 163 Ala. 657, 50 So. 997 (1909), (son using his influence to procure deed for son's employer); Verner v. Mosely, 221 Ala. 36, 127 So. 527 (1930), (attorney/trustee using influence to procure deed for third party); Yarbrough v. Harris, 168 Ala. 332, 52 So. 916 (1910), (attorney using influence to procure deed for third party, who may have been another client).

While concededly the evidence of undue influence is circumstantial, as we have heretofore noted, where the evidence is heard orally before the trial court the finding of the court has the effect of a jury's verdict and will not be disturbed on appeal unless plainly erroneous. Chrisman v. Brooks, supra. Indulging in all appropriate presumptions in favor of the trial court, we cannot state that the trial court's findings of undue influence on the part of respondent Wyatt, of which the other respondents were aware, and lack of consideration for the notes given to respondent Clark are plainly erroneous.

Accordingly, the decree of the trial court is due to be affirmed in all respects.

Affirmed.

HEFLIN, C. J., and McCALL, FAULKNER and JONES, JJ., concur.